## CONTINUATION OF AN APPLICATION FOR A SEARCH WARRANT

I, Heather Williamson, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this continuation as part of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property — specifically, a black Apple iPhone with a multi-color protective case ("the Subject Device"), as described in Attachment A — that is currently in the possession of law enforcement, and the extraction of electronically stored information from the Subject Device, as described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration ("DEA") and have been since January 2013. I am currently assigned to the Grand Rapids District Office.  Previously, I was assigned to the Southwest Border Initiative Group-3 ("SWB-3") and to the Los Angeles Strike Force for approximately six years. The Los Angeles Strike Force is an investigative group jointly led by the DEA and the Federal Bureau of Investigation ("FBI"), and composed of several other federal, state, and local agencies that is focused on the disruption of the Mexico-based Sinaloa Cartel.  Prior to working as a DEA Special Agent, I completed 20 weeks of training at the DEA Academy in Quantico, Virginia, which included narcotics identification, detection, trafficking, and interdiction; money laundering techniques; asset identification, seizure, and forfeiture; and techniques used by narcotics traffickers to avoid detection by law enforcement officials. I have investigated drug trafficking organizations for potential violations of federal laws, including, but not limited to,

unlawful importation of controlled substances, the distribution of controlled substances, manufacturing of controlled substances, and possession with intent to distribute controlled substances, including cocaine, methamphetamine, heroin, fentanyl, and other dangerous drugs, as well as money laundering.

3.      Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect (lingo) and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the federal and state controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of Title 21, United States Code, Section 843(b); and offenses involving money laundering, as well as conspiracy and attempt to do the same, in violation of Title 18, United States Code, Sections 1956 and 1957.

4.      I know from my training and experience that drug traffickers frequently utilize mobile telephones to facilitate drug transactions.  Drug traffickers rely upon voice phone services, SMS and MMS text messaging, social media instant messaging services, and electronic mail apps to communicate with suppliers, customers, and confederates. Mobile telephones are portable, and phone providers often do not

2

require purchasers or users of the devices to provide their true names and/or addresses, so drug traffickers often maintain multiple devices to avoid detection by law enforcement.  Mobile phones often contain evidence of drug trafficking, including records of incoming and outgoing calls; text messages; photographs of narcotics, coconspirators, or currency; and, in the case of "smart phones," Global Positioning System ("GPS") data indicating the location of the device at given points in time. Wireless phones or smart phones also have the capability of facilitating monetary transactions relating to drug dealing, including through the use of cash or bank applications that allow for the electronic transfer of funds.

5.      Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

      a.      Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices;

      b.      Drug traffickers often maintain, on hand, large amounts of currency in order to maintain and finance their on-going narcotics business and often store information related to the profits of their narcotics trafficking on their devices;

      c.      User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation;

      d.      Drug traffickers often use the Internet to look up various information to support their drug trafficking activities on their devices;

e.      Drug traffickers often have unexplained wealth and assets as they do not have a job, nor do they report income on their state or federal tax returns.  Subjects often use cash, money orders, and cashier's checks, and prepaid debit cards as a way of purchasing items as a way to disguise where the funds are ultimately coming from.  Subjects will place assets in the names of nominees, which are often friends and family members in an attempt to hide the true ownership of the assets. It is common for drug traffickers to maintain books, records, receipts, notes, ledgers, receipts relating to the purchase of financial instruments and or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them, including their devices;

f.      It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds on their devices. This evidence includes information related to currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box receipts or keys, records concerning storage lockers and money wrappers; and

g.      Drug traffickers frequently receive their supply of drugs through packages sent by U.S. Mail or third-party delivery service and frequently keep copies of tracking numbers, receipts and photographs of packaged narcotics on their devices.

6.      The information set forth in this continuation is based upon my personal knowledge and participation in the investigation described below, as well as information provided to me by other law enforcement officers. I have not set forth all of the information known to me or known to other law enforcement officers concerning this matter. This continuation is intended to show only that there is sufficient probable cause for the requested search warrant.

4

7.     Based on the information set forth below, there is probable cause to believe that evidence of violations of federal law, specifically Title 21, United States Code, Sections 841 and 846, distribution and/or possession with intent to distribute controlled substances, and conspiracy to do the same, will be found on the Subject Device, which are described in Attachment A. The categories of electronically stored information and evidence sought are described in Attachment B.

## **IDENTIFICATION OF THE SUBJECT DEVICE**

8.     The Subject Device, the property to be searched, is described as a black Apple iPhone with a multi-color protective case which was seized by law enforcement on August 30, 2023 during the execution of the arrest of DANIELLE LENA-MARY JONES ("JONES") for knowingly and intentionally possessing with intent to distribute a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C). The Subject Device is currently located at a secure Michigan State Police facility within the Western District of Michigan.

9.     The applied-for warrant would authorize the forensic examination of the Subject Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

10.     Since at least early 2023, the DEA, the Michigan State Police ("MSP"), and the MSP-sponsored Southwest Enforcement Team ("SWET") and Central Michigan Enforcement Team ("CMET") have been investigating MICHAEL

THOMAS, a/k/a "Money," and his associates, known and unknown, for drug trafficking crimes in the Western District of Michigan, including Kent County and Ionia County.

11.     THOMAS is 37 years old, and his criminal history includes state convictions for misdemeanor traffic violations, possession of marijuana, domestic violence, and felony convictions for delivery/manufacture controlled substance – cocaine or heroin less than 50 grams, possession of a controlled substance – cocaine or heroin less than 25 grams, 3rd degree home invasion, possession of a firearm by a felon, resisting/obstructing/assault of a police officer, and possession of methamphetamine/ecstasy. THOMAS has pending felony drug and firearm charges in Kent County Circuit Court with a trial date of September 11, 2023.

12.     DANIELLE LENA-MARY JONES is 32 years old and does not appear to have any prior criminal convictions. JONES is the half-sister of THOMAS.

13.     On March 8, 2023, CMET and SWET detectives utilized a confidential informant[1] (CI) to purchase methamphetamine and heroin from THOMAS at 660 56th Street, Apartment #7, Grand Rapids, Michigan. CI bought approximately one ounce of methamphetamine and 4 grams of heroin from THOMAS.

14.     On May 1, 2023, CMET and SWET detectives again utilized CI to purchase methamphetamine from THOMAS at 660 56th Street, Apartment #7, Grand

---

[1] Investigators believe CI is credible and reliable through controlled purchases of narcotics and information that has led to the arrest of larceny suspects.

6

Rapids, Michigan. This time, CI bought approximately 4 ounces of methamphetamine from THOMAS.

15.     Based in part on these controlled buys, on or about August 15, 2023 investigators executed a state court-authorized GPS tracker on THOMAS's vehicle, a 2020 Subaru Legacy bearing Michigan registration plate EGC6453 ("the Subject Vehicle"). Specifically, since approximately January 2020, investigators are aware of several drug trafficking cases involving THOMAS to include a U.S. Postal Investigation that yielded the seizure of approximately 2 pounds of crystal methamphetamine, a Grand Rapids Police Department ("GRPD") that yielded the seizure of a quantity of drugs, drug paraphernalia, firearms and U.S. currency and an investigation in the Upper Peninsula that yielded the seizure of 3 pounds crystal methamphetamine.  Investigators subsequently conducted physical surveillance of THOMAS and observed him conduct drug transactions in the parking lot of a residence in Grand Rapids and have observed THOMAS in the Subject Vehicle at his registered address of 660 56th Street, Grand Rapids, Michigan.

16.     In the afternoon of August 30, 2023, through state court-authorized GPS monitoring of the Subject Vehicle investigators learned that the Subject Vehicle was traveling from the Grand Rapids area towards Detroit. Based on prior surveillance of THOMAS and the Subject Vehicle, and my training and experience and the training and experience of other law enforcement officers involved in the investigation, investigators believed that the Subject Vehicle was traveling to Detroit to acquire a new supply of controlled substances for further distribution.

7

17.    At approximately 6:56 p.m. through both GPS monitoring of the Subject Vehicle and physical surveillance by law enforcement officers, investigators saw the Subject Vehicle stop at 15285 Young Street, Detroit, Michigan.

18.    After the Subject Vehicle stopped, a female, later identified as JONES, exited the driver's seat of the Subject Vehicle and walked inside the residence at 15285 Young Street, Detroit, Michigan.

19.    Minutes later, investigators saw JONES leave the residence and get back into the Subject Vehicle and drive away. The Subject Vehicle was stopped at the residence for no more than three minutes.

20.    Immediately after leaving the residence, the Subject Vehicle started "cleaning," a technique that is designed to evade law enforcement detection and surveillance.

21.    Eventually, the Subject Vehicle got back on the interstate and started traveling west away from Detroit back towards the Western District of Michigan. Investigators continued surveillance of the Subject Vehicle as it passed Lansing and entered Ionia County on westbound Interstate 96, within the Western District of Michigan.

22.    Around mile marker 64 on westbound Interstate 96, a marked MSP unit performed a traffic stop on the Subject Vehicle for no insurance, improper window tint, and an obstruction on the rearview mirror.

23.    The MSP Trooper made contact with JONES, the driver and sole occupant of the Subject Vehicle, and advised JONES of the reason for the traffic stop.

8

24.     JONES was not able to produce valid insurance for the Subject Vehicle, and told the MSP Trooper it was someone else's car, and offered to call that person to verify that the Subject Vehicle had insurance.

25.     When asked where she was coming from, JONES stated that she was in Detroit for the day visiting her boyfriend, but she declined to provide an address or specific location.

26.     JONES declined to give consent for the MSP Trooper to search the Subject Vehicle. The MSP Trooper had JONES exit the Subject Vehicle and informed JONES that a K-9 Trooper trained to detect controlled substances was going to perform an open-air sniff around the exterior of the Subject Vehicle.

27.     While running the K-9 Trooper around the exterior of the Subject Vehicle, the K-9 Trooper gave a positive alert on the rear passenger door of the Subject Vehicle.

28.     The MSP Trooper subsequently searched the Subject Vehicle and found a backpack on the floorboard of the rear passenger seat, right where the K-9 Trooper gave a positive alert. Inside the backpack, the MSP Trooper found five individually wrapped bundles of a substance that later field tested positive for methamphetamine, a Schedule II controlled substance, and weighed approximately 11 pounds in total.



29.    JONES denied knowledge of the backpack or its contents and declined to answer questions from law enforcement.

30.    While still on the shoulder of westbound Interstate 96, in the middle of the traffic stop, Vicenta Michel arrived on scene and told investigators that a friend had text her and told her that she was pulled over Ionia and needed help. Based on surveillance and social media posts, investigators believe that Michel is a girlfriend of THOMAS. Before JONES was in custody, JONES was holding the Subject Device and at times appeared to be texting or using the Subject Device. The Subject Device was seized by law enforcement after JONES was in custody.

10

31.     Based on my training and experience, 11 pounds of methamphetamine is a distribution quantity that was intended to be broken down for further distribution.

32.     On August 31, 2023, JONES was charged by federal complaint in the Western District of Michigan with possession with intent to distribute a mixture and substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(C). This Court issued a warrant for JONES's arrest. *See* Case No. 1:23-mj-00395.

33.     The Subject Device has remained in the possession of law enforcement since August 30, 2023, the date of seizure, and have been secured in a state such that the data contained on the Subject Device has not been modified or altered since the date of seizure.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.    Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing

back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:   A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.   Based on my training, experience, and research, I know that the Subject Device has capabilities that allow it to serve as wireless telephone, digital camera, portable media player, and GPS navigation device. It also likely has the ability to connect to the Internet and was likely assigned Internet IP Addresses when connecting to the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and whether the device was used in furtherance of drug trafficking.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have

been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37.    *Forensic evidence.*    As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Device was used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on Subject Device because:

   a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.    The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

14

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Subject Device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39. *Manner of execution.* Because this warrant seeks only permission to examine the Subject Device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

40. I submit that this continuation supports probable cause for a search warrant authorizing the examination of the Subject Device described in Attachment A to seek the items described in Attachment B.